## Cassidy Coal Company v. North Fork Coal Company.

(Decided January 31, 1919.)

## Appeal from Perry Circuit Court. .

1. Contracts—Action for Damages for Breach of—Submission to Court.—Where in a common law action for damages the question of the breach of a contract is submitted to the trial court without the intervention of a jury, his decision will be treated as the verdict of a properly instructed jury, and will not be set aside unless flagrantly against the evidence.

2. Contracts—Agency to Sell Coal.—An exclusive selling agency contract for a term which provides that the agent will use every effort to sell the principal's coal at the highest prices obtainable, and during the dull season of April, May and June will help to keep the mines running and shall not be held responsible for a larger tonnage than actually sold during the dull season, held to obligate the agent to use every effort as a competent agent to sell the output of the mine except during the dull season, at the highest market prices obtainable.

3. Contracts—Agency to Sell Coal.—Where under such contract the agent during a period of six months, not in the dull season, sold less than half the output of the principal's coal mine at a lower price than inexperienced salesmen sold the same grades of coal, and failed to make settlements as provided in the contract, the agent had so violated the vital provisions of the contract as amounted to a breach thereof, and cannot complain that the principal thereafter appointed another agent and refused to quote prices to or fill orders of such original agent.

MILLER, WHEELER & CRAFT and FORMAN & FORMAN for appellants.

WOOTEN & MORGAN and MORGAN & NUCHOLS for appellee.

. OPINION OF THE COURT BY JUDGE CLARKE—Affirming.

Both parties to this action are corporations. The appellee is engaged in operating a coal mine in Perry county, Kentucky, with its chief office at Hazard, while the appellant with its chief office in Lexington, Kentucky,

is a coal merchant and factor. On July 26, 1913, and about the time appellee began to operate its mine, it constituted appellant its selling agent by the following written contract:

"Contract.

"This memorandum of agreement, or contract, made and entered into, by and between the North Fork Coal Company, incorporated, Hazard, Kentucky, party of the first part, and the Cassidy Coal Company, a corporation, of Lexington, Kentucky, party of the second part.

"Witnesseth: That party of the first part hereby agrees to give to the party of the second part, the exclusive sale of their coal mined at Hazard, Kentucky, for a period of one year from date.

"It is agreed by both parties, for and in consideration of the exclusive sale of said coal, the party of the second part will use every effort to sell at the highest price the first party's coal. It is also agreed that party of the second part will advertise, introduce and push said coal to the best possible result.

"Party of the second part further agrees in order to help party of the first part to run the mines during the dull season, which is April, May and June, to do all possible to stock coal with the trade, by taking notes from the customers, if necessary, discounting them at banks in Lexington, Kentucky. Will also help to secure steam and railroad contracts, at the highest prices possible. Party of the second part not to be held responsible for a larger tonnage than they sell during the dull season.

"Party of the second part is to sell said coal at the very highest price obtainable at all times, and they are to receive as commission on sales, 10c per ton of 2,000 pounds for all coal sold for over $1.00 and 5c per ton for all coal sold for $1.00 and less. Railroad weights to govern all settlements.

"It is agreed and understood that all coal sold under this contract is to be invoiced to party of the second part, at the price sold to the trade, and settlements are to be made on the 10th of the month for the preceding month shipments. Commission to be deducted when settlement is made each month.

"It is further agreed and understood that party of the second part is to exhaust every effort to sell coal, by putting salesmen on the road, advertise and push

the sales, and at such times, and such times only, party of the second part is unable to sell the entire output, then the party of the first part has the right to go out in the trade and sell the surplus, and there is no commission to be paid party of the second part for such sales. Under these conditions said coal to be invoiced direct to the trade by the party of the first part, and party of the second part is not to be held responsible for such credit, unless they agree in writing.

"Party of the first part reserves the strike clause, and are not to be held responsible for strikes, shut outs, and shortage of cars, and other causes beyond their immediate control.

"It is agreed that should any inquiries for coal go to the party of the first part, then party of the first part is to send same to the party of the second for answer.

"Party of the first part agrees to produce a merchantable coal and to prepare and clean same so it will not handicap the sale at high prices.

"It is further agreed between party of the first part and party of the second part, that party of the first part has the right to name the price from month to month for said coal, but it is understood that same must be a competitive price, and one not too high to secure business.

"Witness our hands this the 26th day of July, 1913.
                "NORTH FORK COAL COMPANY.
                        By C. G. Bowan, Pres.
                "CASSIDY COAL COMPANY.
                        By T. D. Cassidy, Pres.

"It is agreed and understood that should first party sell any coal to L. & N. Railroad Company, second party is to receive no commission on same.
                "CASSIDY COAL COMPANY.
                        "By T. D. Cassidy."

On May 4, 1914, by the following written endorsement, the life of the above contract was extended:

"It is agreed that this contract be extended for one year from the expiration on July 26th, 1914, with the privilege of extending it another year from July 26th, 1915, to July 26th, 1916, unless parties of the second part make sale of this mine, and in that event the parties of the first part shall relinquish their right of renewal after

July 26th, 1915, but parties of the second part, should they sell the mine, are to use their influence to get the purchasers to let first parties the sale of the coal.

"This May 4, 1914.

"NORTH FORK COAL COMPANY.
By C. G. Bowen, President.
"CASSIDY COAL COMPANY.
By T. D. Cassidy, President."

On June 1, 1915, appellee filed this action against appellant, to recover for coal delivered upon its orders under said contract during 1915, a balance of $129.44 for January, due February 10th; $2,145.60 for February, due March 10th, and $575.45 for March, due April 10th; and for $172.75 for freight advanced on February 15th, with interest and costs, less a credit of $191.21, for commissions due appellant.

Appellant answered admitting the several items of indebtedness, but claiming as a set off $112.83 for various items, and as counterclaim $3,000.00 damages for breach of the contract beginning February 24, 1915, in failing to furnish prices on its coal or accept orders and in making the Maynard Coal Company its exclusive selling agent. Appellee by reply, in addition to a traverse of the set off and counterclaim, pleaded in avoidance of the counterclaim a prior breach of the contract by appellant during the months from August, 1914, to February, 1915, in failing to sell the output of the mine, or to sell at the highest market prices, or to pay its accounts as due.

Upon these issues the case was tried before and submitted to the court, a jury being waived, resulting in a judgment for the appellee for the amount claimed less $111.22, which is substantially the amount claimed by appellant in its set off, but dismissing the counterclaim, and the question here on appeal is whether the decision of the court, treated as the verdict of a properly instructed jury, is flagrantly against the evidence with reference to appellee's alleged breach of contract.

Upon that question the evidence is substantially that prior to August, 1914, appellant sold the output of appellee's mine at prices satisfactory to appellee, and there is no complaint that settlements were not made therefor according to the contract, but it is proven by appellee and not denied by appellant that from September, 1914, until March 20, 1915, appellant sold less than one-half of the output of the mine, exclusive of what the L. & N.

Railroad Company took; that what it did sell it sold at prices below what appellee during the same period got for the same grades of coal, in an amount something over $500.00 on the 219 cars sold by appellant, and that during this period appellant did not settle its accounts according to contract, but was at all times behind in its payments; that appellee was constantly writing or wiring appellant to send in more orders and to pay up its account; that the appellee was frequently required to shut down its mines because of lack of orders; that its employees were leaving it and its business becoming demoralized because of the frequent shut downs; that it was required to borrow money to meet its pay rolls, which it would not have had to do if appellant had paid its accounts as due, and that it about March 20, 1915, made the Maynard Coal Company its exclusive selling agent, and thereafter refused to accept from appellant an order for fifty car loads of coal a month from March to August, 1915, or to quote it prices on its coal.

Appellant's testimony is in effect that following August, 1914, it had a salesman on the road in Ohio and sold as much of appellee's coal as it could, at the best prices it could obtain and settled therefor in a manner that appellee accepted and to its satisfaction so far as it knew, but not denying the settlements were not in accordance with the contract.

It will therefore be seen that if the contract obligated appellant to sell the total output of the mine, exclusive of what the L. & N. Railroad Company bought direct of appellee as the contract authorized, there can be no question but that the appellant had so violated the vital provisions of the contract before February 24, 1915, when it claims appellee breached it by appointing another agent as to defeat its right to complain thereof. Harris v. Gardner, 68 S. W. 8; Stapleton v. Ewell, 55 S. W. 917; Peck v. Peck, 102 U. S. 64, 26 L. Ed. 46.

Counsel for appellant, however, insist such is not the meaning of the contract, although they insist the contract gave to appellant the exclusive right to sell all of appellee's coal, except such as the L. & N. Railroad Company bought, a very peculiar contract indeed, if such is its effect, because it would have made appellee's ability to operate or exist as a mining company, depend upon appellant's ability to sell coal, and such a construction could be justified only if that intention were clearly expressed.

The contract in explicit terms constitutes appellant the exclusive selling agent in its very first clause, but there are several provisions that place upon appellant the duty, as we read the contract, of selling the entire output of the mine, except such coal as the L. & N. Railroad Company bought and except during the dull season of April, May and June.

The second clause states that appellant "will use every effort to sell at the highest price first party's coal" and "will advertise, introduce and push said coal to the best possible result," as the consideration for the exclusive agency.

It will be noticed this is not ordinary diligence, but requires of appellant "every effort" to sell *appellee's coal,* which can mean only *all* of the coal appellee could produce at its mine, except during the dull season especially provided for, during which period appellant agrees to help appellee run its mines, and then follows the especially significant provision that appellant is "not to be held responsible for a larger tonnage than they sell during the dull season." Can any one escape the conclusion that except during this anticipated dull season appellant was to be "held responsible" for the whole output? It does not seem so. But even if it be held that appellant was only to use such diligence as might be implied from "every effort" to be expected of a competent sales agent, to sell all of appellee's coal at the highest prices obtainable, which certainly is the least required of appellant, the evidence still convicts appellant of either incompetency or a failure to exert "every affort" it might have exerted, because during the months from September, 1914, to February, 1915, appellee's president and secretary, without any previous selling experience so far as the record discloses, when they found appellant was not sending in enough orders, although begged to do so, went out in the market and sold 384 cars to appellant's 219, at much better prices than it obtained. And when you add to this the admitted fact that appellant did not settle for what it sold according to contract and to appellee's injury, it seems to have been conclusively established that appellee was forced by appellant's failure to function as an exclusive selling agent, to abandon either its mining enterprise or its exclusive agent. This was clearly such a breach of the contract by appellant as released appellee from its further observance.

We therefore conclude the trial court's decision upon this question of fact submitted without a jury, is not only not flagrantly against the evidence, but is entirely justified by it.

The alleged breach of the contract by appellee prior to February 24, 1915, in failing to turn over to appellant inquiries and orders coming direct to appellee, is not sustained, for upon this question the testimony for appellant is simply that none were received by it, while the testimony for appellee is that prior to appellant's failure to sell its output, all such letters were forwarded to appellant, although no particular order or inquiry could be designated.

Wherefore the judgment is affirmed.